467 P.2d 256

**LECHUGA, INC., a California corporation, Appellant,**

v.

**Eddie MONTGOMERY, Appellee.**

**No. 1 CA–CIV 1197.**

Court of Appeals of Arizona, Division 1, Department A.

April 9, 1970.

Rehearing Denied May 8, 1970.

Review Denied June 9, 1970.

Beer & Kalyna, by Olgerd W. Kalyna, Phoenix, for appellant.

Westover, Keddie & Choules, by Tom C. Cole, Yuma, for appellee.

STEVENS, Judge.

The application of the doctrine of strict liability in tort to lessors is presented in this appeal from the Superior Court of Yuma County.

Plaintiff-appellee, Eddie Montgomery, brought suit against defendant-appellant, Lechuga, Inc., a California corporation, for personal injuries he sustained as a result of the use of a truck owned by the defendant and leased to plaintiff's employer. Defendant by its answer placed in issue its negligence, the contributory negligence of the plaintiff and the defense of the assumption of risk. After the close of the evidence and at the time of settling instructions, plaintiff requested and was granted permission to amend his complaint to add allegations of strict liability in tort. The plaintiff had forewarned the defendant of his intention to request this amendment.

The jury returned a verdict in favor of plaintiff and after denial of defendant's post trial motions, this appeal followed.

Defendant is the owner of certain trucks used in the harvesting of lettuce. These trucks were leased to Vukasovich, Inc., plaintiff's employer. The lease provided that defendant was to keep and maintain the trucks in good and serviceable condition.

In connection with the leasing operation, defendant maintained a storage yard and maintenance shop in Yuma, Arizona, where the leased trucks were delivered each evening and picked up in the morning by lessee's employees. The lessee dispatched all trucks, and assigned individual drivers to each truck. It was the duty of the individual drivers before taking the trucks out each morning to check the tires, water and oil and to start and warm up the engines. Some of these operations required the engine cover to be lifted. Because of the special construction of these trucks and their height, it was necessary to walk onto an area which would be the right front fender of an ordinary automobile and lift the engine cover. These engine covers weighed between eighty and eighty-five pounds. The cover is hinged at the front of the truck and opens from the back of the engine to the front. Most of the trucks were equipped with a chain which was attached to the engine cover and the frame of the truck to keep the engine cover from swinging over the front of the truck and damaging the cover. The "safety chain" was of sufficient length to allow the engine cover to be raised to a height where a metal rod could be easily inserted between the engine cover and the frame of the truck and thus allow the engine cover to remain open and to make the engine compartment accessible. It was also the duty of the individual driver to report to the defendant's mechanics any malfunctions of the various trucks.

On the morning of 18 February 1967 the particular truck involved in this accident had been assigned by plaintiff's employer to one Frank Mills, this truck's normal driver. The truck was not equipped with a safety chain. Mills was aware of its absence but he had not brought this to the attention of defendant's employees. After performing the normal checking procedures including raising the engine cover and closing it, Mills climbed into the cab and attempted to start the engine warm-up procedure. The engine did not start. The plaintiff, among others, was of the opinion that the "emergency kill switch" had been activated. The "emergency kill switch" is a device which is activated inside the cab and is used to stop the engine from running in emergency situations. In order to deactivate the switch, it was necessary to lift the engine cover and turn a mechanism located on the engine.

Plaintiff volunteered to assist his fellow employee in resetting this switch. He had no knowledge that this particular truck had no safety chain. The plaintiff climbed up on the catwalk over the right front wheel, stooped to grasp the handle on the engine cover, and proceeded to lift the cover. As he pulled up, the cover continued to rise to a point where it became overbalanced and went over the front of the vehicle. Plaintiff was unable to extract his hand from the engine cover handle, lost his balance, fell and injured his leg.

Defendant presents several questions on appeal which may be summarized as follows:

(1) Was the evidence sufficient to submit to the jury the liability of the defendant under the theory of negligence?

(2) Does the doctrine of strict liability in tort apply to lessors of chattels?

(3) If the doctrine applies, was the absence of a safety chain a "defective condition, unreasonably dangerous" within the concept of this doctrine?

(4) Was plaintiff precluded from maintaining this action because of the Workmen's Compensation Laws of the State of Arizona?

## ORDINARY NEGLIGENCE

Defendant first contends that there was insufficient evidence to submit the

question of defendant's liability to the jury under ordinary theories of negligence. This evolves itself into a determination of whether defendant owed a duty to the plaintiff, whether it breached that duty, and whether that breach was a proximate cause of plaintiff's resultant injury. Massengill v. Yuma County, 104 Ariz. 518, 456 P.2d 376 (1969). Defendant's duty as the lessor of chattels is stated in Restatement (Second) of Torts § 408 (1965):

"One who leases a chattel as safe for immediate use is subject to liability to those whom he should expect to use the chattel, or to be endangered by its probable use, for physical harm caused by its use in a manner for which, and by a person for whose use, it is leased, if the lessor fails to exercise reasonable care to make it safe for such use or to disclose its actual condition to those who may be expected to use it."

This same duty of a lessor of personal property is imposed in Arizona. See Patterson v. Chenowth, 89 Ariz. 183, 360 P.2d 202 (1961); Casey v. Beaudry Motor Co., 83 Ariz. 6, 315 P.2d 662 (1957). That defendant was required to lease a chattel as safe for immediate use is evidenced by its lease with plaintiff's employer, which contained language that defendant covenanted to maintain and keep the trucks it leased in a "good and serviceable condition." This is further evidenced by testimony that all needed repairs to the leased trucks were to be reported to defendant's employees.

The lease itself also provided that plaintiff's employer was to "provide and pay for all operators" of the leased trucks. The jury could reasonably conclude that plaintiff was among the class of persons which defendant "should expect to use the chattel."

Tacitly admitting these factors, the defendant argues that since the absence or presence of a safety chain does not affect the primary use for which the truck was leased, the harvesting of lettuce, defendants breached no duty to the plaintiff. However, the evidence discloses that among other duties imposed upon the drivers of the leased trucks was the duty, each morning, to check the oil and add any, if necessary. While the first function did not necessarily require the lifting of the engine cover, the evidence disclosed that this was a general practice among the lessee's employees. The function of adding oil necessitated the raising of the engine cover. We hold that the duty to supply a truck reasonably safe for the purpose for which it was intended, not only includes the general intended use, that is, the transportation of lettuce, but also includes any incidental use of that truck consistent with its general leased purpose, including placing the truck in such a condition that it will perform its leased purpose. From all the testimony, there was sufficient evidence to submit to the jury whether or not plaintiff's injury by the truck was "caused by its use in a manner for which * * * it is. leased."

The evidence further disclosed that all of the leased trucks which plaintiff had driven were equipped with a "safety chain." Plaintiff testified that he came to rely on the existence of this chain in raising the engine cover. Because of this reliance, the length of the chain, the length of the rod in supporting the cover when raised, and the weight of the engine cover itself when compared to the physical strength of the lessee's several employees, we believe there was sufficient evidence from which the jury could find that the injuries suffered by the plaintiff were foreseeable by the defendant.

From what has been stated, whether defendant's failure to provide plaintiff's employer with a truck having a safety chain or ascertaining that the chain was missing was a breach of the duty of defendant to "exercise reasonable care" to make this truck safe, was a proper jury question.

We hold that there was sufficient evidence to submit to the jury the question of the defendant's duty, whether that duty was breached, and whether that breach resulted in a proximate cause of plaintiff's injury.

## STRICT LIABILITY

■ Defendant's second contention raises a question of first impression in Arizona, that is, the applicability of the doctrine of strict liability to lessors, who are neither manufacturers, sellers, retailers nor wholesalers. However, we need not make such a determination in this case, for our conclusion as to plaintiff's burden of proof as to this doctrine is dispositive of this issue. Under these circumstances we are not called upon to decide whether the doctrine of strict liability applies to lessors of personal property or whether the doctrine applies under the circumstances of this particular commercial lease transaction. The nature of the defect complained of in this action is the absence of a safety chain to prevent the engine cover from falling over the front of the vehicle. In order for plaintiff to assert the applicability of the doctrine of strict liability he has the burden of proving that this defect was present when the truck was first placed in the stream of commerce. O. S. Stapley Co. v. Miller, 103 Ariz. 556, 447 P.2d 248 (1968); Ford Motor Co. v. Lonon, 217 Tenn. 400, 398 S.W.2d 240 (1966); Greeno v. Clark Equipment Co., 237 F.Supp. 427 (D.Ind.1965); Annot., 13 A.L.R.3d 1057, 1082 (1967); Restatement (Second) of Torts § 402A, comment g (1965).

■ We turn then to the evidence presented by the plaintiff in this case as it deals with his proof of condition of the truck when it was initially placed in the stream of commerce by the defendant. Suffice it to say, there is none. In fact, we are unable to determine whether a chain on this particular truck was even present at the time the truck was leased to plaintiff's employer, let alone when defendant might have first leased this truck. For this reason, the plaintiff failed to sustain his burden of proof as to strict liability and the trial court erred in instructing the jury on this doctrine. Since we are unable to determine from the verdict whether the jury found for the plaintiff on the question of negligence or on the question of strict liability, we must grant the defendant a new trial in this matter.

## WORKMEN'S COMPENSATION

■■ Defendant's last contention deals with the application of the Workmen's Compensation Act. Defendant reasons that since the lease between the defendant and plaintiff's employer contained a "hold harmless" clause running in defendant's favor, if the plaintiff is successful in this suit against the defendant, the ultimate judgment would be paid by the plaintiff's employer, in contravention of the Workmen's Compensation Act. In this case, we see nothing in the Workmen's Compensation Statute, or as a matter of public policy, which would prohibit an employer from contractually making himself liable for his employees' injuries. We do not, however, intend to intimate that in our opinion the plaintiff's employer would be liable under the particular hold harmless clause used in this lease for the lessor's own negligence, or if such were the case, that such a clause avoiding liability for one's negligence would or would not be against public policy.

Judgment reversed and this cause is returned to the trial court for proceedings consistent with this opinion.

DONOFRIO, P. J., concurs.

JACOBSON, Judge (concurring).

I agree with the majority of this court that a reversal of this case is required because of the failure of the plaintiff to sustain his burden of proof as to the applicability of the doctrine of strict liability to the defect present here. However, since our decision in this matter requires a new trial be granted, I feel the issue as to the applicability of this doctrine to lessors, as applied to this case, must be met in order to determine whether or not plaintiff on the retrial and upon the presentation of proper evidence would be entitled to an instruction on this issue.

The Arizona Supreme Court has specificially held that § 402A of the Restatement (Second) of Torts (1965) shall be followed in Arizona in applying the doctrine of strict liability. O. S. Stapley Co. v. Miller, *supra*. This section, insofar as applicable, provides as follows:

"One who *sells* any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the *seller* is engaged in the business of *selling* such a product * * *." (Emphasis added.)

As can be seen, this section of the Restatement deals specifically with "sellers," and makes no mention of lessors of personal property. Moreover, Wagner v. Coronet Hotel, 10 Ariz.App. 296, 458 P.2d 390 (1969) held that:

"The theory of strict liability in tort applies only to those who are engaged in the business of *selling* products for use or consumption, such as a manufacturer, wholesaler, retailer, or distributor. (cases cited)." (Emphasis in original.) 458 P.2d, at 394.

However, disregarding the expressed designation in the Restatement, at least two jurisdictions[1] have extended the rule of strict liability to include lessors of personal property.

On the other hand, the Federal District Court of Pennsylvania, applying the law of Pennsylvania, in Speyer, Inc. v. Humble Oil & Refining Co., 275 F.Supp. 861, *aff'd*, 403 F.2d 766 (3d Cir. 1968), has specifically rejected the application of the doctrine of strict liability to lessors of personal property.

In making a determination as to whether or not the doctrine should apply to lessors in Arizona, a foundational inquiry into the reasons underlying the development of this doctrine is aptly in order.

It is apparent from a reading of the Restatement, and the leading cases on this subject, that the doctrine of strict liability was evolved to place liability on the party primarily responsible for the injury occurring, that is, the manufacturer of the defective product. This, as Justice Traynor stated in his concurring opinion in Escola v. Coca Cola Bottling Co. of Fresno, 24 Cal.2d 453, 150 P.2d 436 (1944), is based on reasons of public policy:

"If public policy demands that a manufacturer of goods be responsible for their quality regardless of negligence there is no reason not to fix that responsibility openly." 150 P.2d, at 441.

These public policy considerations have been variously enumerated as follows:

(1) The manufacturer can anticipate some hazards and guard against their recurrence, which the consumer cannot do. Restatement, *supra*, comment c.

(2) The cost of injury may be overwhelming to the person injured while the risk of injury can be insured by the manufacturer and be distributed among the public as a cost of doing business. Greenman v. Yuba Power Products, Inc. [59 Cal.2d 57], 27 Cal.Rptr. 697, 377 P.2d 897 (1962).

(3) It is in the public interest to discourage the marketing of defective products. Escola v. Coca Cola Bottling Co. of Fresno, *supra*.

(4) It is in the public interest to place responsibility for injury upon the manufacturer who was responsible for its reaching the market. Greenman v. Yuba Power Products, Inc., *supra*.

(5) That this responsibility should also be placed upon the retailer and

---

1. Cintrone v. Hertz Truck Leasing & Rental Service, 45 N.J. 434, 212 A.2d 769 (1965); McClaflin v. Bayshore Equipment Rental Co., 79 Cal.Rptr. 337 (Cal.App.1969); Price v. Shell Oil Co., 79 Cal.Rptr. 342 (Cal.App.1969).

wholesaler of the defective product in order that they may act as the conduit through which liability may flow to reach the manufacturer, where ultimate responsibility lies. Vandermark v. Ford Motor Co. [61 Cal.2d 256], 37 Cal.Rptr. 896, 391 P.2d 168 (1964).

(6) That because of the complexity of present day manufacturing processes and their secretiveness, the ability to prove negligent conduct by the injured plaintiff is almost impossible. Escola v. Coca Cola Bottling Co. of Fresno, supra.

(7) That the consumer does not have the ability to investigate for himself the soundness of the product. Santor v. A and M Karagheusian, Inc., 44 N.J. 52, 207 A.2d 305 (1965).

(8) That this consumer's vigilance has been lulled by advertising, marketing devices and trademarks. Concurring opinion, Lockwood, J., Nalbandian v. Byron Jackson Pumps, Inc., 97 Ariz. 280, 399 P.2d 681 (1965).

Inherent in these policy considerations is not the nature of the transaction by which the consumer obtained possession of the defective product, but the character of the defect itself, that is, one occurring in the manufacturing process and the unavailability of an adequate remedy on behalf of the injured plaintiff.

For this reason I find no logical basis for differentiating between the liability to an injured consumer of a dealer who is in the business of selling an automobile which is in a defective condition because of the manufacture thereof, and a dealer who is in the business of leasing the same automobile. Obviously, the liability should be the same—strict liability in order to reach the ultimate culprit, the manufacturer. The distinction to be made is not in what capacity the dealer acts, that is, as seller or lessor, but in the nature of the defect itself, that is, was it the result of either design or manufacture?

My determination in this matter would appear to be contrary to the Supreme Court's statement that the rule in Arizona is that set forth in the Restatement which refers only to "sellers." However, my reading of the Arizona Supreme Court decisions on this subject leads me to the conclusion that the Arizona Supreme Court would not hesitate to hold that the term "seller" is a term designating a class (one in the business of placing products in the stream of commerce) rather than a designation of limitation.

Because of my analysis of the underlying policy considerations and my determination that the designation of the transaction insofar as the ultimate consumer is concerned is not controlling but that the nature of the defect of the product is, I am unable to agree with the reasoning of either the New Jersey or California courts. The cases previously cited in footnote 1 of this concurring opinion from these two jurisdictions would seem to elevate a lessor to the status of manufacturer without a determination of the underlying defect which caused plaintiff's injuries. I am likewise unable to agree with the Pennsylvania case which categorically denied liability under the doctrine of strict liability because the defendant was not a "seller."

As I view the problem, the nature of the defect is primarily a question of plaintiff's proof. If plaintiff in this action could prove that defendant Lechuga was in the business of leasing trucks and that the truck on which plaintiff was injured initially came into the hands of defendant, that is, when it was first placed in the stream of commerce, without the necessary safety chain, I would have no difficulty in determining that a prima facie case for the application of the doctrine of strict liability had been proven. After such a prima facie showing, the burden then shifts to the defendant to show, if he is able, that the particular defect was not the result of manufacture. Greco v. Bucciconi Engineering Co., 283 F.Supp. 978 (W.D.Pa.1967), aff'd, 407 F.2d 87 (3d Cir. 1969); 21 Stanford L.Rev. 1777 (1969).

The defendant next contends that in any event the absence of the safety chain was not a "defective condition unreasonably dangerous." The courts have had some difficulty in defining this term. After reading many definitions, I am of the opinion that the definition offered by the Restatement is the most logical: if the product reaches the ultimate consumer in a condition not contemplated by him and that condition renders that product unreasonably dangerous to him, a "defective condition" exists. Restatement, supra, comment g. While I express some concern that the absence of a chain to keep an engine cover from falling would render the use of that engine cover "unreasonably dangerous," this must be a question for the trier of facts looking at all the attendant circumstances.

In view of my conclusion on this subject, on a retrial of this matter, I would not preclude the plaintiff from offering proof as to the applicability of the doctrine of strict liability to the facts in this case, and if such proof was sufficient, instructing the jury on this issue.